

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

**ENTERED**
**04/03/2015**

| | | |
|---|---|---|
| In re: | § | |
| | § | |
| **CTLI, LLC,** | § | Case No. 14-33564 |
| | § | |
| **Debtor** | § | Chapter 11 |
| | § | |

**MEMORANDUM OPINION ON JEREMY ALCEDE'S EMERGENCY MOTION**
**OBJECTING TO PROPOSED ORDER REGARDING SOCIAL MEDIA ACCOUNTS**
**[Doc. No. 259]**

## I.    Introduction

This Memorandum Opinion addresses issues arising from the refusal of the former majority owner of this Chapter 11 corporate debtor to relinquish control of the debtor's social media accounts to the bankruptcy estate. This dispute raises issues of first impression regarding whether social media can ever be property of a bankruptcy estate. This Court concludes that business social media accounts are property of a company's bankruptcy estate. Finding that the accounts at issue are business and not personal accounts, the Court now orders the former owner to transfer administrative privileges to these accounts immediately to the reorganized debtor. Finally, this Court analyzes all possible property or privacy interests that the former owner might have in the debtor corporation's social media accounts. The Court concludes that requiring the former owner to transfer administrative privileges to the reorganized debtor does not violate any privacy rights that he claims to have.

## II.    Factual Background

This case arises out of the Chapter 11 reorganization of CTLI, LLC (the Debtor), which prior to bankruptcy was doing business as Tactical Firearms, a gun store and shooting range in Katy, Texas. The Debtor was formed in 2011 and was originally wholly owned by Jeremy

Alcede and his then-wife Sarah Alcede. [Doc No. 26, p. 3, ¶8]; [Mot. to Use Cash Collateral &

Mot. to Pay Prepetition Wages Hr'g Tr. 16:21–25, July 3, 2014] (hereinafter July 3 Hr'g Tr.).

Originally, the Debtor sold guns and ammunition but did not operate a firing range. [July 3 Hr'g

Tr. 16:21–17:4]. Later in 2011, Mr. Alcede recruited his wealthy friend, Steven Coe Wilson, to

purchase a bigger building for the Debtor for $2.2 million in exchange for a 30% membership

interest in the Debtor corporation. [*Id.* at 17:14–25]; [Cont. Hr'g on Mot. For Use of Cash

Collateral & Hr'g on Exp. Mot. To App't T'ee & Terminate Exclusivity 25:5–15, July 11, 2014]

(hereinafter July 11 Hr'g Tr.). Mr. Wilson's entry enabled the Debtor to expand and open the

"finest indoor firing range in the country." [Plan Agent's Ex. 3].

While the Debtor appeared to prosper, internal disputes between the owners began to

fester. Mr. and Mrs. Alcede began divorce proceedings in November of 2012, [July 11 Hr'g Tr.

25:5–15], and relations between Mr. Alcede and Mr. Wilson deteriorated after Mr. Wilson began

to suspect Mr. Alcede of diverting cash obtained through the sale of the used shells from the gun

range. [Doc. No. 26, pp. 3–4, ¶¶9–11]. Consequently, Mr. Wilson instituted a derivative action

against Mr. Alcede in state court in November 2013, requesting that the Debtor be put in

receivership. [Doc. No. 26, p. 4, ¶11]. The state court enjoined the Alcedes from diverting

corporate assets or interfering with Mr. Wilson's management rights, but initially refused the

request for receivership. [*Id.* at p. 4, ¶12].

The Debtor subsequently defaulted on several loans. [July 11 Hr'g Tr. 23:24–29:1]. On

June 10, 2014, Icon Bank of Texas, N.A., the major creditor of the Debtor, posted the Debtor's

real property for foreclosure. [Doc. No. 26, p. 5, ¶14]. On June 26, 2014, the state court

approved Mr. Wilson's request and ordered the appointment of a receiver for the Debtor. [Doc.

No. 26, p. 6, ¶17]. The very next day, before a receiver could take control, Mr. Alcede caused

the Debtor to file a Chapter 11 petition, [Doc. No. 1], which in turn resulted in the automatic stay barring the receiver from taking control of the Debtor and allowed Mr. Alcede to remain in control.

In bankruptcy court, Mr. Wilson quickly sought to have a trustee appointed to take control of the Debtor. [Doc. No. 26]. This Court did not appoint a trustee—thereby allowing Mr. Alcede to remain in control of the Debtor—but it did grant Mr. Wilson's request to terminate exclusivity so that he could propose a Chapter 11 plan of reorganization. [Doc. No. 75]. Mr. Wilson thereafter proposed a plan (the Plan), [Doc. No. 177], which was confirmed on December 8, 2014, [Doc. No. 237] (the Confirmation Order). Under the Plan, Wilson became the 100% owner of the reorganized Debtor. [Doc. No. 177, p. 12, ¶7.1]. This Court's order confirming the Plan required Mr. Alcede to "deliver possession and control" of "passwords for the Debtor's social media accounts, including but not limited to Facebook and Twitter" to Mr. Wilson on behalf of the reorganized Debtor.[1] [Doc. No. 237, p. 7, ¶57(2)]. In a status conference held on December 11, 2014, this Court discovered that Mr. Alcede had failed to honor that instruction. Mr. Wilson's counsel filed a Certificate of Noncompliance on December 12, 2014. [Doc. No. 248]. In consequence, this Court found Mr. Alcede in contempt. [Doc. No. 242].

At a hearing on December 16, 2014, this Court heard testimony and admitted evidence presented by Mr. Wilson and Mr. Alcede regarding the social media accounts. At this hearing, Mr. Alcede claimed that all social media accounts at issue belonged to him personally and not to the Debtor.[2] [Hr'g on Social Media Tr. 14:5–13; 49:21–22, Dec. 16, 2014] (Hereinafter Dec. 16

---

[1] Mr. Wilson is the Plan Agent (i.e. the person responsible for implementing the terms of the Plan) and throughout this Opinion the Court will refer to his exhibits as Plan Agent's Exhibits but will refer to him as Mr. Wilson.

[2] Under the Plan, all property of the Debtor re-vested in the reorganized Debtor on the Confirmation Date, which, as defined under the Plan, was December 8, 2014. Therefore, technically, by the time of the hearing held on December 16, 2014, the social media accounts could not possibly have belonged to the Debtor, but could only belong to either the reorganized Debtor or—if one accepts Mr. Alcede's argument—to Mr. Alcede.

Hr'g Tr.).   Further, Mr. Alcede argued that it would be impossible to share control of these accounts with the reorganized Debtor without violating his privacy.   [*Id.* at 49:21–50:7].   This Court issued an initial ruling that a neutral third party court aide should be retained to sort the personal from the business content within the social media accounts.   [*Id.* at 54:5–23].   Mr. Alcede stated on the record that he agreed with this approach.   [*Id.* at 56:1–7].   However, when Mr. Wilson's counsel filed a proposed order with this Court reflecting this initial ruling, Mr. Alcede objected to the proposed order.   [Doc. No. 259].   On February 12, 2015, this Court held a hearing on Mr. Alcede's objection.   After considering relevant legal authorities and the exhibits admitted and testimony adduced at the December 16, 2014 hearing and the February 12, 2015 hearing, against the background of all other testimony and filings in this Chapter 11 case, the Court now finds that the reorganized Debtor is entitled to direct control of 100% of one Facebook Page and one Twitter account, and that the assistance of an independent third party is not necessary.

## III.   Conclusions of Law

### A. Jurisdiction

The Court has jurisdiction over this dispute pursuant to 28 U.S.C. §§ 1334(b) and 157(a). Section 1334(b) provides that "the district courts shall have original but not exclusive jurisdiction of all civil proceedings arising under title 11, or arising in or related to cases under title 11." The district courts may, in turn, refer "any or all proceedings arising under title 11 or arising in or related to a case under title 11 . . . to the bankruptcy judges for the district." § 157(a). In the Southern District of Texas, General Order 2012–6 automatically refers all "[b]ankruptcy cases and proceedings arising under Title 11 or arising in or related to a case under Title 11" to the bankruptcy courts. The Bankruptcy Code grants bankruptcy courts

authority to "direct the debtor and any other necessary party to . . . perform any . . . act . . . that is necessary for the consummation of the plan." 11 U.S.C. § 1142(b).[3] "Proceedings invoking the bankruptcy court's statutory authority to enter orders necessary for the consummation of a confirmed plan" are "proceedings arising in" cases under title 11. *In re U.S. Brass Corp.*, 301 F.3d 296, 306 (5th Cir. 2002); *In re Craig's Stores of Texas, Inc.*, 266 F.3d 388, 390–91 (5th Cir. 2001). The provision of the Confirmation Order directing anyone with estate property to turn it over to the Plan Agent is necessary for the consummation of the Plan, which vests ownership of all estate property in the reorganized Debtor. [Doc. No. 75, ¶7.1; Doc. No. 237, p. 7; ¶57]. Therefore, this matter invokes this Court's authority to enter orders necessary for the consummation of the Plan, and thus this Court has jurisdiction over this matter.

Further, this Court has jurisdiction over this dispute because it involves enforcement of the Confirmation Order. Specifically, the Confirmation Order requires Mr. Alcede to "deliver possession and control" of "passwords for the Debtor's social media accounts, including but not limited to, Facebook and Twitter," to the reorganized Debtor. [Doc. No. 237, p. 7, ¶57(2)]. A bankruptcy court has jurisdiction to enforce its own confirmation orders, particularly to ensure that the confirmed plan is implemented pursuant to its very terms. *Travelers Indem. Co. v. Bailey*, 557 U.S. 137, 151 (2009).

### B. Venue

Venue is proper pursuant to 28 U.S.C. § 1408(1), which provides that:

> a case under title 11 may be commenced in the district court for the district . . . in which the domicile, residence, principal place of business in the United States, or principal assets in the United States, of the person or entity that is the subject of such case have been located for the one hundred and eighty days immediately preceding such commencement . . . .

---

[3] Any reference to "the Code" refers to the United States Bankruptcy Code, and reference to any section (i.e., §) refers to a section in 11 U.S.C., which is the United States Bankruptcy Code, unless otherwise noted. Further, any reference to "the Bankruptcy Rules" refers to the Federal Rules of Bankruptcy Procedure.

Here, virtually all of the assets of the Debtor were located in Katy, Texas on the date of the filing of the Chapter 11 petition. Thus, venue is clearly proper.

### C. Constitutional Authority to Enter a Final Order

In the wake of the Supreme Court's ruling in *Stern v. Marshall*, 131 S.Ct. 2594 (2011), this Court must also evaluate whether it has the constitutional authority to enter a final order adjudicating the dispute at bar. In *Stern*, the Supreme Court held that 28 U.S.C. § 157(b)(2)(C)—which authorizes bankruptcy judges to issue final judgments in counterclaims by a debtor's estate against entities filing claims against the estate—is an unconstitutional delegation of Article III authority to bankruptcy judges, at least when the dispute being adjudicated is based solely on state common law and does not affect the claims adjudication process. *Id.* at 2616.

The dispute at bar is not a counterclaim of the Debtor, nor does it arise out of state law. Rather, the dispute at bar arises out of objections to the enforceability of the Confirmation Order, which requires Mr. Alcede to turn over estate property to the reorganized Debtor. The dispute thus arises from this Bankruptcy Court's authority under § 1142 to order third parties to cooperate in the consummation of a bankruptcy plan. State law has no equivalent to § 1142; it is purely a creature of the Code. Further, this dispute requires this Court to enforce its own Confirmation Order, which is governed by federal common law, not state law. *See, e.g.*, *Chambers v. Nasco*, 501 U.S. 32, 43 (1991) (holding that federal courts have the inherent power to require "submission to their lawful mandates"). Accordingly, because the resolution of this dispute is not based solely on state common law, but rather is based upon a provision of the Code and federal common law, this Court has the constitutional authority to enter a final order.

### D. An Introduction to Facebook and Twitter

The instant dispute involves one central question: what social media property belongs to the reorganized corporate Debtor as opposed to Mr. Alcede, personally?  This Court concludes that the Facebook Page that Mr. Alcede refers to as his "likes" page and the sole Twitter account discussed at the hearings are both property of the reorganized Debtor, and not the personal property of Mr. Alcede.  As an initial matter, this Court notes that Mr. Alcede's choice of terminology to refer to the social media accounts is misleading, perhaps deliberately so.  A brief introduction to the social media property at issue is thus necessary to prevent confusion.

#### 1. Facebook

Facebook is the preeminent social networking website of the current moment, and as of the time of this opinion, it boasts approximately 1.39 billion monthly active users. http://newsroom.fb.com/company-info/ (accessed April 1, 2015).  While anyone can visit individual Facebook Pages and Profiles and view information that has been made public, to have access to the full range of Facebook features one must be a registered Facebook User.  A Facebook User provides Facebook with his or her name, birthdate, sex, and an email address or phone number and is then granted a Facebook Profile, which the User can personalize with biographical information.  The User is then prompted to "friend" other Users, beginning with the User's personal contacts and branching out to Users with mutual Friends.  Facebook Users can post Status Updates, photos and videos, and Life Events to Facebook.  These posts appear on the User's Timeline (the User's personal page) and on the Newsfeeds (Facebook home pages) of the User's Facebook Friends.  The Facebook User can also access other features, such as sending individual or group Messages to Facebook Friends, and creating Facebook Events and Facebook Groups.

In addition to interacting with other individual Users, Facebook provides Pages for "businesses, brands and organizations."[4]  A Facebook Page is created by an individual User to represent an organization or brand, and that User becomes the first Page Admin, which enables him or her to customize the Page, post Status Updates and photos, and access other features. Facebook Users can "like" the Page to become Fans who will then see the Page's posts in their Newsfeeds.  The first Page Admin can then grant other Facebook Friends various degrees of administrative access to the Page.  Full access grants the new Admin equal powers to the original Admin, including the ability to remove the original Admin.

Mr. Alcede refers to his personal Facebook Profile as his "friends page" and to the former Tactical Firearms Facebook Page as his "likes page."  The Court finds these terms unhelpful for an understanding of Facebook.  Therefore, the Court will refer to Mr. Alcede's personal Facebook Profile as his "Facebook Profile" and to the former Tactical Firearms Page as the "Tactical Firearms Facebook Page," the "former Tactical Firearms Facebook Page," or the "Jeremy Alcede Entrepreneur Facebook Page."

### 2. Twitter

Twitter is the next most popular social media platform after Facebook, with an estimated 288 million monthly active users.  https://about.twitter.com/company (accessed April 1, 2015). Unlike Facebook, the default setting in Twitter is to allow Twitter Users to freely "follow" one another without the necessity of being approved by each other.  When Users "follow" each other, they will see each other's "Tweets" (like Facebook Status Updates) in their Twitter feeds. Tweets are limited to 140 characters, or less if the User includes a photo.  Twitter Users often includes links to web sites in Tweets.  Users can tag each other in Tweets using the "@" symbol

---

[4] Facebook Help Center, Pages Basics, https://www.facebook.com/help/281592001947683/ (accessed April 2, 2015).

followed by a user's "Handle"—a unique identifier that can also be used to locate the User's individual Twitter page (twitter.com/"Handle").   Users also "Retweet" each other's Tweets. Additionally, Twitter users can tag topics with the "#" symbol, known as a hashtag.   Other Users can filter their feeds to view all Tweets with any given hashtag.   These features have made Twitter an important social media platform for tracking trends.

**E. Business Social Media Accounts Fall within the Bankruptcy Code's Broad Definition of "Property of the Estate."**

Now that the Court has described the social media at issue in the instant dispute, the Court must determine whether these social media accounts were property of the Debtor's estate and are now property of the reorganized Debtor.

The Code defines "property of the estate," with enumerated exceptions, as "all legal or equitable interests of the debtor in property as of the commencement of the case."   11 U.S.C. § 541.   "Section 541 is read broadly and is interpreted to include all kinds of property, including tangible or intangible property [and] causes of action . . . ."   *In re Equinox Oil Co., Inc.*, 300 F.3d 614, 618 (5th Cir. 2002) (citing *United States v. Whiting Pools, Inc.*, 462 U.S. 198, 204–5 & n.9 (1983).   For specific determinations of what constitutes property, bankruptcy courts look to the underlying state law.   *Butner v. United States*, 440 U.S. 48, 54 (1979).

Unfortunately, no Texas state courts have considered whether social media accounts are property interests.   In one conversion case, a federal district court, applying Florida law, held that the plaintiff did not have a property interest in the "likes" on a Facebook Page.   *Mattocks v. Black Entm't Television LLC*, 43 F.Supp.3d 1311, 1321 (S.D. Fla. 2014).   That court reasoned that because individual Fans can "unlike" the Page at any time, the Page creator has no ownership interest in the likes.   *Id.*   However, a federal bankruptcy court, applying New York law, has treated social media accounts as property, grouping them with subscriber lists.   *In re*

*Borders Grp., Inc.*, No. 11-10614 MG, 2011 WL 5520261, at *13 (Bankr. S.D.N.Y. Sept. 27, 2011). Many courts, applying the law of their respective states, have also held that subscriber or customer lists are property interests. *See, e.g., In re Alert Holdings, Inc.*, 148 B.R. 194, 203 (Bankr. S.D.N.Y. 1992).

Given the above-referenced holdings, and with one eye cocked on the broad scope of § 541, this Court finds that business social media accounts are property interests. Like subscriber lists, business social media accounts provide valuable access to customers and potential customers. The fact that those customers and potential customers can opt out from future contact does not deprive the present access of value. Just as Facebook Users can "unlike" a Page at any time, subscribers to email lists can also, by federal law, opt out at any time. CAN-SPAM Act of 2003, Pub. L. 108-187, § 2, Dec. 16, 2003, 117 Stat. 2699, 15 U.S.C. Ch. 103.

### F. The Property Interest in Business Social Media Accounts is Different from the Property Interest in Individual Social Media Accounts.

The characterization of *individual*—as opposed to business—social media accounts as property is much more difficult. The Facebook Page or Profile of a celebrity or other public figure is a different type of property, related to the interest known as a *persona*. A *persona* is "the interest of the individual in the exclusive use of his own identity, in so far as it is represented by his name or likeness, and in so far as the use may be of benefit to him or to others." *Brown v. Ames*, 201 F.3d 654, 658 (5th Cir. 2000) (quoting Restatement (Second) of Torts § 652C (1977)). Although heretofore unrecognized by bankruptcy courts, in most states, including Texas, the *persona* is recognized as a property interest, and therefore that falls within the broad reach of "property of the estate." *See Matthews v. Wozencraft*, 15 F.3d 432, 437 (5th Cir. 1994) (recognizing the *persona* as property under Texas law). The primary limitation on recognition of a *persona* as estate property is the 13th Amendment's prohibition on involuntary

servitude.  Just as a debtor may not assume contracts that would require any individual to perform personal services, 11 U.S.C. § 365(c); *Matter of Tonry*, 724 F.2d 467, 469 (5th Cir. 1984), a debtor may not use estate property in a manner that would require any individual to perform personal services.  Because the value in a Facebook Page or Profile lies in the ability to reach Friends or Fans through future communications, the property interest in an individual Profile would likely not become property of the estate.  *See generally Smita Gautam, #bankruptcy: Reconsidering "Property" to Determine the Role of Social Media in the Bankruptcy Estate*, 31 Emory Bankr. Dev. J. 127, 127 (2014) (arguing that an individual debtor's interest in his social media accounts should be treated as a "liberty" interest instead of a "property" interest).  However, the official Page of a celebrity or public figure that is managed by employees might be treated differently.  *See generally* Melissa B. Jacoby & Diane Leenheer Zimmerman, *Foreclosing on Fame: Exploring the Uncharted Boundaries of the Right of Publicity*, 77 N.Y.U. L. Rev. 1322, 1347–57 (2002) (discussing how *persona* might be disentangled from personal services in general).

### G. The Former Tactical Firearms Facebook Page is a Business Page of the Reorganized Debtor and not a Personal Page of Mr. Alcede.

Mr. Alcede, in his capacity as majority owner of the Debtor, created a Page for the Debtor and entitled it "Tactical Firearms."  The fact that this was a Page (for "businesses, brands and organizations," not "individual people"[5]) entitled "Tactical Firearms" raises a presumption that it was the Debtor's Facebook Page, is now the reorganized Debtor's Facebook Page, and has never been Mr. Alcede's personal Facebook Page.  Further inquiry into the characteristics of the former Tactical Firearms Facebook Page cements this conclusion.

---

[5] Facebook Help Center, Pages Basics, https://www.facebook.com/help/281592001947683/ (accessed April 2, 2015).

First, the former Tactical Firearms Facebook Page was directly linked to the Tactical Firearms web page.[6]  Second, Mr. Alcede used the former Tactical Firearms Facebook Page to post Status Updates on behalf of "Tactical Firearms" relating to, among other subjects, guns. [Plan Agent's Ex. 2].  Many of Mr. Alcede's posts were expressly business-related; for example, he advertised the store's Black Friday sale and new inventory, and he spoke for the store with phrases like, "on behalf of myself and the Tactical Firearms family."  [*Id.*]; [Dec. 16 H'rg Tr. 43:21–44:18].  Mr. Alcede in fact admitted that he used the page for promoting Tactical Firearms business.  [Dec. 16 H'rg Tr. 10:17–19].  He also granted access for a Tactical Firearms employee to post Status Updates to the Tactical Firearms Facebook Page directly through the business's Constant Contact account, an email marketing tool.  [*Id.* at 11:16–23; 40:4–21].  These Status Updates directly promoted Tactical Firearms's products and services.  [*Id.* at 11:16–23].  Finally, Mr. Alcede shared his personal Facebook login information with a business associate so that this associate could post Status Updates to the Tactical Firearms Facebook Page promoting the company's products.  [*Id.* at 42:17–43:20].  This particular use of the Tactical Firearms Facebook Page was clearly to generate revenues for the company, and confirms that this Page belongs to the reorganized Debtor.

### H. Mr. Alcede's Evidence that He Started the Tactical Firearms Facebook Page for Personal Reasons, Used It to Publish Personal Posts, and Accessed It Through His Personal Profile Is Insufficient to Establish It as His Personal Property.

In support of his contention that the Former Tactical Firearms Facebook Page should be characterized as his personal property, Mr. Alcede argues that he started the page for personal reasons, used it to share personal posts, and accessed it through his personal Profile.  At most,

---

[6] The Court used the internet archive website "web.archive.org" to determine that as of December 18, 2014, the Facebook link at tacticalfirearms.us navigated to https://www.facebook.com/pages/Tactical-Firearms/142934489112780, which is the former Tactical Firearms Facebook Page and current Jeremy Alcede Entrepreneur Facebook Page.  The link has since been changed and at the time of this opinion directs simply to https://www.facebook.com.

this evidence establishes that Mr. Alcede conceived of the Tactical Firearms business as an extension of his personality.   However, the evidence is utterly insufficient to overcome the presumption that the Facebook Page entitled "Tactical Firearms" at the time of the Plan confirmation was anything other than what it appeared to be: a business Facebook Page for the business known as Tactical Firearms.

### 1. The Fact that Mr. Alcede Created the Page After Becoming Aware of Facebook's Friend Limit Does Not Make It His Personal Property.

In the hearings, Mr. Alcede argued that he created the Tactical Firearms Facebook Page (which he has since re-named "Jeremy Alcede Entrepreneur") because he reached Facebook's limit of 5,000 Friends on his personal Profile and thus his Friend requests were being automatically denied.   [*Id.* at 10:4–12].   Due to the mechanisms of Facebook described above, Mr. Alcede now refers to his personal Profile as his "friends page" and the former Tactical Firearms Page as his "likes page." [Hearing of February 12, 2015, at 11:05 a.m.].   As discussed *supra* in Section III.D.1, the Court rejects this nomenclature.

The Court is skeptical of Mr. Alcede's purported rationale for creating the Tactical Firearms Facebook Page.   Mr. Alcede contends that he had reached the limit of Facebook Friends and therefore Facebook was automatically denying his Friend Requests.   [Hearing of February 12, 2015, at 1:08 p.m].   However, as of December 18, 2014, Mr. Alcede personally had only 4,423 Facebook Friends.   [Alcede's Ex. 9].[7]   While it is possible that Mr. Alcede had more Friends when he created the Tactical Firearms Facebook Page, such a precipitous decline in Mr. Alcede's popularity is unlikely.   Furthermore, if Mr. Alcede had really created the Page to

---

[7] The Court carried an objection to admitting Alcede's Exhibit 9.   The Court now overrules the objection, finding that Mr. Alcede laid a sufficient foundation for the exhibit given his *pro se* status. *See Ortiz v. Cornetta*, 867 F.2d 146, 147 (2d Cir. 1989) ("Once a *pro se* litigant has done everything possible to bring his action, he should not be penalized by strict rules which might otherwise apply if he were represented by counsel."); *Austin v. Ellis*, 408 A.2d 784, 785 (N.H. 1979) (commending the lower court's relaxation of the rules of evidence for a *pro se* litigant).

promote himself personally, he would have originally entitled it "Jeremy Alcede." Apparently, since the filing of the Plan, Mr. Alcede has created an individual Page specifically to promote his personal "brand," and therefore two "Jeremy Alcede" Facebook Pages exist in addition to the personal "Jeremy Alcede" Facebook Profile: "Jeremy Alcede Entrepreneur" (the former Tactical Firearms Facebook Page) and "Jeremy Alcede Patriot."[8]  Mr. Alcede, conveniently, has never mentioned this fact to the Court.

However, even if Mr. Alcede did indeed create the Tactical Firearms Facebook Page because he was approaching the Friend limit, it would not affect the character of the Tactical Firearms Facebook Page.  It may be true that Mr. Alcede, like many small business owners, closely associated his own identity with that of his business, so closely that he entitled the Facebook Page "Tactical Firearms" "for people to know it was me." [Dec. 16 H'rg Tr. 21:6–7]. Nonetheless, Mr. Alcede and the Debtor are—and always have been—two distinct legal entities, with separate and distinguishable property.  The fact that the Tactical Firearms Facebook Page was created in the name of the business, was linked to the business's web page, and was used for business purposes places it squarely in the category of property of the Debtor's estate (and now property of the reorganized Debtor) and *not* personal property of Mr. Alcede.

### 2. The Fact that Other People Were Responsible for Some Business-Related Posts Strengthens the Conclusion that the Tactical Firearms Facebook Page Has Always Been a Business Page.

Mr. Alcede suggests that the fact that some especially business-related posts were made through Constant Contact or by a business associate, and not by himself personally, reduces their weight in characterizing whether the Page is business or personal.  [Dec. 16 H'rg Tr. 11:16–23; 42:17–43:13].  On the contrary, the fact that Mr. Alcede gave an employee of Tactical Firearms

---

[8] The Court notes, at the time of this Opinion, the existence of the "Jeremy Alcede Patriot" Page at https://www.facebook.com/pages/Jeremy-Alcede-Patriot/316480998547437.  The first post appearing on this Page is dated December 6, 2014.

access to post to the Page through a paid marketing tool, and the fact that he gave a vendor access specifically to promote the company's products, supports the conclusion that the Tactical Firearms Facebook Page is a business Page.

### 3. The Fact that Mr. Alcede May Have Posted Content to the Page Referencing Himself as an Individual Does Not Establish that the Majority of the Facebook Posts Were "Personal" or Transform the Page into His Personal Property.

Mr. Alcede also places significant emphasis on the fact that he sometimes posted "personal" Status Updates to the Tactical Firearms Facebook Page, i.e., Status Updates that Mr. Alcede contends are not business-related.

First, this Court notes that Mr. Alcede's emphasis on the "personal" character of the social media accounts is inconsistent with his emphasis, at prior hearings in this Chapter 11 case—when he was still in control of the Debtor—of the substantial amount of time he spent using these accounts for business purposes.[9]  For example, at one of the initial hearings in this case on the amount of salary Mr. Alcede should draw from the estate, Mr. Alcede testified that he answers "thousands" of Facebook Messages each day and stays up late commenting publicly on the Facebook Page. [Hr'g on Cash Collateral Mot. For Doc. Prod. Tr. 18:11–20:13, Aug. 22, 2014].  Mr. Alcede also described his activity on the Facebook and Twitter accounts as a significant business activity: "It's just very important that I stay in tune with social media because that's how people follow us and that's how they support us and that's how they hear about what we're doing." [*Id.* at 19:10–13].  Mr. Alcede now attempts to distinguish Messages as an ancillary feature of Facebook, while upholding Posts as the core feature. [*See* Dec. 16 Hr'g Tr. 49:21–22] ("The posts, which is the meat and potatoes and the gist of Facebook, are my

---

[9] This Court has the right in issuing its ruling today to use testimony of a prior hearing months ago. *See, e.g., In re Prince Preferred Hotels Shreveport 2, LLC*, No. 14-10427, 2014 WL 3887957, at *1 (Bankr. W.D. La. Aug. 7, 2014); *In re Posey*, 81 B.R. 416, 416 (Bankr. N.D. Miss. 1987); *In re Palumbo Family Ltd. P'ship*, 182 B.R. 447, 464 (Bankr. E.D. Va. 1995).

personal, and that has never changed"). The Court finds no reason to accept Mr. Alcede's arbitrary elevation of one Facebook feature over another, and finds that Mr. Alcede's use of Facebook Messages to communicate with customers through the former Tactical Firearms Facebook Page, in addition to his clearly business-related posts, is strong evidence that the former Tactical Firearms Facebook Page is a business Page.

Second, this Court does not accept Mr. Alcede's definitions of "personal" versus "business-related" posts. Mr. Alcede expressed where he draws the line most clearly in testimony concerning the Twitter page. Mr. Alcede provided, as an example of a "personal" and non business-related Tweet, his Tweet about his attendance at Shot Show, a firearms exposition. [*Id.* at 34:4–14]. He contrasts this Tweet with an example of a hypothetical "business-related" Tweet, arguing "You don't see things on here that say, 'Come in and buy an Era 15 for $550.' You're not going to see come in here and—I don't care how many posts you go through." Mr. Alcede testified that his "Shot Show" Tweet reflects the very essence of social media:

> I mean that's the whole point of Twitter is to let people know where you are. And so everybody wants to go to Shot Show but they can't because they're not a dealer. And so I was just letting people know that I was there. It's just a matter of fact.

[*Id.* at 35:9–13].

The Court agrees with Mr. Alcede that the "Shot Show" Tweet is prototypical social media use. This is exactly why the Court disagrees that it is a strong example of a "personal" Tweet of Mr. Alcede's, as opposed to a Tweet promoting the Debtor's business. The very nature of social media dictates that its best use for business is somewhat more subtle than other forms of marketing. A Tweet advertising the fact that the owner of a gun store is at a gun show, far from being especially "personal" in nature, is a perfect example of this kind of subtle marketing. This Tweet most assuredly served to develop Mr. Alcede's reputation as being a well informed,

16

connected insider in the gun-buying community, a reputation that would attract consumers to the business of Tactical Firearms that he was running at the time he issued this Tweet.

Finally, the history of Mr. Alcede's activities promoting the Debtor specifically supports the characterization of political posts as business-related, as opposed to personal expression of political beliefs. While Mr. Alcede was in charge of the Debtor, the Debtor was known for its marquee displaying messages promoting gun rights and criticizing President Barack Obama—no doubt with the objective of increasing gun and ammunition sales. Such messages include: "I like my guns like Obama likes his voters / undocumented", "Threatening to sue POS Obama and pro open carry is why I love Greg Abbott", "Honk if you support open carry / Don't tread on me", "We have hit Barack bottom / go vote red", "Does one of Obama's family members have to be beheaded for "change" to happen?", and "Will trade Obama to Mexico for Sgt Tahmooressi / God help us all." [Plan Agent's Exs. 2 & 3]. The store frequently received news coverage for its signs. [Plan Agent's Ex. 2]. At one point, the Debtor held a contest encouraging "ALL FRIENDS, FANS, AND MOST OF ALL LOYAL CUSTOMERS" to submit messages for the marquee, with the winner receiving a one year family gold range membership worth $560!" [*Id.*].

Mr. Alcede himself has stated to this Court: "I don't mean to toot my own horn, but I'm a PR genius . . . ." [July 11 H'rg Tr. 125:16–17]. This Court finds that Mr. Alcede's political messages on the store's marquee and via social media were a manifestation of this genius. Given this context, regarding overtly political posts and tweets, the Court agrees with the Plan Agent's counsel, who stated: "[I]t's very hard for me to stipulate that anything on this page is not business related due to the nature of the business and the fact that this type of business is frequently affiliated with a particular political affiliation." [Dec. 16 Hr'g Tr. 31:4–8]. Indeed,

17

this Court finds that all of these political posts and Tweets are related to the Debtor's business and were issued with the purpose of generating publicity for the business in order to increase sales of guns and ammunition.

### 4. The Fact that Mr. Alcede Did Not Grant Anyone Else Administrative Privileges to the Tactical Firearms Facebook Page Does Not Affect the Page's Character.

Mr. Alcede's most vehement argument against characterizing the former Tactical Firearms Facebook Page as a business Page is that it is only accessible through his personal Facebook Profile: "And I can't stress enough that it is a sublink of my Jeremy Alcede Friends page, and that is the only way to access it." [Dec. 16 Hr'g Tr. 46:18–20]. Since Mr. Alcede did not give anyone else administrative privileges to the Tactical Firearms Facebook Page, technically speaking, he is correct. But this fact, understood properly in the context of Facebook's business features generally, is of no use to Mr. Alcede. As explained *supra* in Section iii.D.1, all business Pages are initially accessible only by the initial Admin, through the initial Admin's User Profile. The initial Admin, however, has complete power to protect his privacy while granting other Users full Admin privileges to the Page. Pages can be managed by multiple individuals with Profiles, so that no individual needs access to any other individual's personal information in order to manage the Page—the Court cannot stress this point enough.

### I. The Former Tactical Firearms Twitter Account Is a Business Account of the Debtor and Not a Personal Account of Mr. Alcede.

The Court also concludes that the sole Twitter account discussed at the hearings has clearly been a business account. As with the former Tactical Firearms Facebook Page, the name assigned to the Twitter account was originally "Tactical Firearms" and the Twitter Handle was "@tacticalfirearm" (missing the "s" due to Twitter's character limit for Handles). [Plan Agent's Ex. 3]. The summary provided for the Twitter account was "We are a local gun store with the

best prices, knowledge, and customer service available. We are now home of the finest indoor shooting range in the country." *Id.* As of the time of this Opinion, the link on the Tactical Firearms web page still directs to https://twitter.com/tacticalfirearm, the former URL of the Tactical Firearms Twitter account. Mr. Alcede testified that he does not recall whether he changed the name on the Twitter account from "Tactical Firearms" to "Jeremy Alcede." However, the Court finds that he did make this change based on its close inspection of Plan Agent's Exhibit 3. Exhibit 3, a screenshot of the Twitter account entitled "Jeremy Alcede", shows a Tweet under what appears to be the former name "Tactical Firearms." Therefore, the Court finds that the Twitter account entitled "Jeremy Alcede" is the same as the account formerly entitled "Tactical Firearms."

Further, the Court finds that the Twitter account admitted as Plan Agent's Exhibit 3, bearing the Twitter Handle "@tacticalfirearm", is the same as the account that, as of the time of this Opinion, bears the Handle "@jeremyalcede." The Court so holds after comparing the accounts and observing that the five most recent photos, visible in Exhibit 3, perfectly match five chronological photos still visible at twitter.com/jeremyalcede; and also observing that the number of "followers" and "following" Twitter users is strikingly close (7,880 following and 7,352 followers shown in Exhibit 3 compared with 7,863 following and 7,205 followers shown at twitter.com/jeremyalcede as of the date of this writing).

The fact that the Twitter account was named after the business, included a description of the business, and was linked to the business's web page raises a presumption that the Twitter account has always been a business account. Mr. Alcede's dispute with this conclusion is premised solely on his contention that "95%" of the account's Tweets were personal. [Dec. 16 Hr'g Tr. 35:14–20]. However, Mr. Alcede provided only one example of such a Tweet, and as

19

addressed *supra* in Section III.H, this Court finds that it was not in fact a "personal" Tweet, but instead served to promote the Tactical Firearms brand. Therefore, this Court finds that the Twitter account formerly located at @tacticalfirearm and now located at @jeremyalcede is a business account of the reorganized Debtor. It is *not* a personal account of Jeremy Alcede.

### J. The Goodwill an Individual Employee Contributes to the Value of a Business Social Media Account Is Either Business Goodwill that Remains in the Account, or Professional Goodwill that Follows the Individual.

The liberty concerns inherent to individual social media accounts do not apply to business social media accounts, even if the business is closely associated with an individual. However, this Court must address another concern specific to an individual who is closely associated with a business's social media account—the *professional goodwill* of the individual which may be reflected in that account. This Court finds that while an individual is using the business's account, some of the individual's professional goodwill may be reflected in the account's followers along with the business goodwill. The bankruptcy estate includes only the value of the social media reflected by the business goodwill, and not the professional goodwill. Yet, the Court finds this reality is no limitation on the reorganized Debtor's right to control its social media accounts, because any goodwill legitimately belonging solely to the individual will follow the individual.

A business social media account is in a sense a manifestation of the business's accrued goodwill. *See Smita Gautam, #bankruptcy: Reconsidering "Property" to Determine the Role of Social Media in the Bankruptcy Estate*, 31 Emory Bankr. Dev. J. 127, 134 (2014) (including goodwill as an element of value in a social media account). The goodwill of a company is developed by its employees over the years. Nonetheless, whatever goodwill the individual caused to be associated with the business remains property of the business. *See In re Thomas,*

20

246 B.R. 500, 502, 508 (E.D. Pa. 2000) (characterizing goodwill of professional corporation as business goodwill over protestation of sole employee of corporation). If the individual leaves the business and some goodwill is thereby withdrawn, that goodwill is properly characterized as *professional goodwill* that is the sole property of the departed employee. *See id.* at 508 (distinguishing the goodwill of the corporation from goodwill which is "inextricably tied" to an individual and cannot survive if the individual leaves the corporation).

This Court finds that the proper way to characterize Mr. Alcede's interest in the reorganized Debtor's social media accounts is as an interest in professional goodwill, and the Court allows that Mr. Alcede may have developed some such goodwill that is manifested by the Debtor's Facebook Fans and Twitter followers. However, the Court finds that recognizing the business social media accounts as property of the reorganized Debtor does not deprive Mr. Alcede of any of this professional goodwill, if it indeed exists. The line of demarcation between professional and personal goodwill is precisely the line between goodwill that departs with the professional and goodwill that remains with the business. *See id.* Therefore, Mr. Alcede is unimpeded in his ability to control whatever property interest he legitimately holds in the reorganized Debtor's social media accounts. Whichever followers embody the goodwill that legitimately inheres in Mr. Alcede, as opposed to the corporate reorganized Debtor, are free to follow him to his own personal Facebook Page, entitled "Jeremy Alcede Patriot," and to a personal Twitter account which he is free to reestablish with the title "Jeremy Alcede" and Handle "@jeremyalcede." The extent of the loss of followers to the business accounts and subsequent gain in followers by Mr. Alcede will reflect the true extent of his personal interest in the accounts.

In conclusion, this Court finds that the social media accounts of Tactical Firearms were, pre-confirmation, property of the estate, and there is no reason not to treat them as the Court would treat any other assets belonging to the estate.  Accordingly, because the social media accounts were property of the estate, and because the Plan vested all assets of the estate with the reorganized Debtor, this Court holds that the reorganized Debtor should have full control over these social media accounts.

## IV.    Relief to Be Granted

Unfortunately, the novel social media context of this case complicates not only the legal issues, but the relief that is available to the reorganized Debtor.  At the hearing on December 16, 2014, Mr. Alcede informed this Court that he had submitted a request to Facebook to change the name of the "Tactical Firearms" Page to "Jeremy Alcede Entrepreneur," and that once Facebook approved this name change, it would be irreversible.  [Dec. 16 Hr'g Tr. 51:5–9].  For Pages with less than 200 likes, Facebook allows Admins unlimited name changes, but for Pages with 200 or more likes, the one-time-change policy takes effect.[10]  This policy in itself suggests that Facebook is aware of the property interest inherent in a popular Page and the importance of helping the rightful owner protect this interest.  On December 5, 2014, when Mr. Alcede requested the name change, [Dec. 16 Hr'g Tr. 22:1–4], the Tactical Firearms Facebook Page had more than 11,000 likes, [*id.* at 19:21–23].  Therefore, when Facebook approved the change, it was permanent.  [Hearing of February 12, 2015, at 2:16 p.m.].

Ever since Mr. Wilson proposed the Plan providing for his 100% ownership of the Debtor, Mr. Alcede has been posting content on the former Tactical Firearms Facebook Page that

---

[10] Facebook Help Center, How do I change my Page's name?, https://www.facebook.com/help/127563087384058/ (accessed April 2, 2015).

could damage the reputation of the reorganized Debtor.  The following examples are from the

Court's perusal of the former Tactical Firearms Facebook Page on April 1, 2015:

- On December 5, 2014, the Page shows a long post signed "Your patriot, Jeremy Alcede" that reads, in part: "Coe [Mr. Wilson] has admitted under oath that his intentions from the beginning where [sic] to bankrupt the company and take it from me. . . . The problem I have with this is that MANY if not ALL employees (mainly Vets) will loss [sic] their job [sic] during the Christmas season. Everyone knows how hard it is for them the [sic] find a job in the civilian world so please keep them and their families in your prayers. Coe's [Mr. Wilson's] allegations against me where [sic] proven false in both District and Federal Court and that is why I have been left in control of Tactical Firearms through these proceedings."[11]

- On January 6, 2015, the Page shows a post that reads, in part: "John Boyert [the general manager of the reorganized Debtor] told everyone he was 70% owner of Tactical Firearms before the plan was approved and when I questioned him about it on the stand he perjured himself as he knew it went against the plan Steven Coe Wilson submitted to the judge and would put it in jeopardy. If you were told he was the owner of Tactical Firearms please email me jjalcede@yahoo.com."[12]

- On January 27, 2015, the Page shows a post that reads: "Tactical Firearms Update I think everyone should know the BS games John Boyert and Steven 'Coe' Wilson are still playing! We purchased a Hummer for the company which has always been in the companies [sic] name but to save the company money I personally took out the loan to get a lower interest rate. Well they stopped making payments on the loan even though they have possession and use of the Hummer which is hurting my personal credit. Since the Hummer is registered in the company name I can't do anything about this. I was advised yesterday that they are considering allowing it to get repossessed. It's not enough that they stole my company but now they want to destroy my personal credit?!?! Please let everyone know what is going on and feel free to voice your opinion to the new owners![13]

- On January 30, 2015, the Page shows a video of Mr. Alcede attempting to enter the Debtor's property with a concealed handgun, with the following caption: "It's funny how a gun store owner, a sheriff's deputy, and an attorney think it's ok to violate my Constitutional Right and the law! They quickly realized they were wrong.  Everyone's asking for detail leading up to this. Being wrapped up in it I forget not everyone knows. The takeover was instant so I wasn't able to remove

---

[11] The Court notes that the reorganized Debtor has continued to operate the business and that there has not been a mass layoff of employees.

[12] The Court notes that Mr. Alcede has failed to prove the allegation that Mr. Boyert "told everyone he was 70% owner of Tactical Firearms" before the Plan was confirmed.

[13] The Court notes that the reorganized Debtor has paid off the indebtedness owed on the Hummer.  [Doc. No. 323].

my personal belongings (which are a lot). The judge ordered me to go and take pics to show him and to get permission to remove them." [14]

- On February 2, 2015, after the Plan Agent filed a motion for sanctions against Mr. Alcede based on his entering the store with the concealed handgun, the Page shows an image of the motion with the caption: "Awe it looks like someone is butt hurt because someone exercised their 1st amendment right. Then he wants to misconstrue it as a threat and them [sic] somehow make me accountable and continue to say that these are not my personal accounts. And people still wonder why some mothers eat their young? I have court tomorrow morning @ 10am at 515 Rusk St Houston TX 77002 to finally put this facebook nonsense to rest if anyone would like to join."

- On February 4, 2015, the Page shows a post with the caption: "I have awesome friends!" accompanied by a screenshot of an "Unsubscribe Confirmation" stating the reason for unsubscribing: "I subscribed to get emails from Tactical Firearms and Jeremy Alcede, not some jack asses that ripped him off and stole his business. Go to hell!"[15]

This Court can order Mr. Alcede to turn over access to the former Tactical Firearms Facebook Page to the reorganized Debtor, which will prevent Mr. Alcede from posting this type of negative content in the future.  However, this Court cannot enable the reorganized Debtor to change the former Tactical Firearms Facebook Page's name to reflect the current business name. Only Facebook can provide this relief.  Therefore, this Court will order Mr. Alcede to transfer administrative privileges to the former Tactical Firearms Facebook Page to the reorganized Debtor.  The reorganized Debtor may request further relief from Facebook, and should Facebook not grant the requested relief, the reorganized Debtor may, at that point, seek compensatory damages from Mr. Alcede.

---

[14] The Court notes that it has provided Mr. Alcede the opportunity to prove which personal belongings he believes are still on the premises of the gun store, but Mr. Alcede has failed to file any pleadings in this Court alleging which property belongs to him or alleging that the reorganized Debtor has prevented him from taking possession of these belongings.

[15] The Court notes that no one stole Mr. Alcede's business.  It was Mr. Alcede who voluntarily chose to place Tactical Firearms into a Chapter 11.  Once he did, this Court allowed Mr. Alcede to stay in control of the business while he attempted to obtain financing for the company.  However, Mr. Alcede failed to accomplish this objective. Meanwhile, Mr. Wilson filed the Plan, it received support from creditors of the company, and this Court confirmed the Plan.  Under the Plan, Mr. Wilson took control of the business.  Accordingly, Mr. Wilson did not steal the business, but rather acquired it legally through the bankruptcy that Mr. Alcede himself initiated.

**A. This Court Will Order Mr. Alcede to Cede Control of the Jeremy Alcede Entrepreneur Facebook Page to the Reorganized Debtor.**

The relief that this Court is empowered to order regarding Facebook is simple enough. In an order accompanying this Opinion, the Court will instruct Mr. Alcede to transfer complete administrative control of the Jeremy Alcede Entrepreneur Facebook Page to the reorganized Debtor by making Mr. Boyert, the general manager of the reorganized Debtor, an "Admin" of the Page. This approach will enable the Mr. Boyert to remove Jeremy Alcede as an Admin of the Page. The transfer of sole control of the former Tactical Firearms Facebook Page to the reorganized Debtor will benefit the reorganized Debtor in that it will stop the barrage of vitriol that Mr. Alcede currently posts on the former Tactical Firearms Facebook Page concerning the reorganized Debtor and Mr. Wilson. To stop this barrage as soon as possible, this Court will further order Mr. Alcede to immediately cease all his activity with regard to the Jeremy Alcede Entrepreneur Facebook Page with the exception of the activity necessary to transfer administrative privileges in the Page to the reorganized Debtor.

**B. The Reorganized Debtor May Seek Further Relief from Facebook.**

Though the Court can provide some relief as described *supra* in Section IV.A, without changing the name back to a business name, the reorganized Debtor will not be able to utilize most of the former Tactical Firearms Facebook Page's value. The Court is aware of two forms of possible avenues by which Facebook could address this problem. First, Facebook could make an exception to the single-name-change policy in order to allow the reorganized Debtor to rename the Jeremy Alcede Entrepreneur Facebook Page to reflect the business's current name. This would conform with Facebook's policy concerning Page names, which currently prohibits names which "mislead others into thinking it is an official Page of the Page's subject matter or is

authorized by an authorized representative of the Page's subject matter."[16]   Under this policy,

"Jeremy Alcede Entrepreneur" is a misleading name for a Facebook Page belonging to the

reorganized Debtor, in which Jeremy Alcede no longer has any interest.   Second, Mr. Wilson

could request that Facebook "migrate" Fans to a new Page representing the reorganized Debtor.

*See, e.g.*, *Mattocks v. Black Entm't Television LLC*, 43 F.Supp.3d 1311, 1316–17 (S.D. Fla. Aug.

20, 2014) (describing an instance when Facebook "migrated" Fans of a television show fan Page

to another Page after the television network terminated the official status of the first Page).  If the

reorganized Debtor requests relief from Facebook and relief is denied, the reorganized Debtor

may then want to seek compensatory damages from Mr. Alcede.

### C. This Court Will Order Mr. Alcede to Cede Control of the "@jeremyalcede" Twitter Account to the Reorganized Debtor.

Relief for the Twitter account is a simpler matter than relief for the Facebook account.  A

Twitter User is free to change his Handle, "Name", "Bio", associated email address, and

password freely.  To transfer control over to the reorganized Debtor, Mr. Alcede thus only needs

to change: (1) the password to a password he is willing to share with Mr. Boyert[17]; and (2) the

email address to an email address accessible by Mr. Boyert.  Mr. Boyert will then receive an

email prompting him to confirm the changes to the account, and will thereafter be able to log in

using the password provided by Mr. Alcede.  Mr. Alcede will probably choose to change the

Handle and Name back from his personal name before transferring this control, in order to

preserve these for his own personal use with a new account.  With the exception of those

optional changes and the changes necessary to transfer administrative privileges in the Twitter

---

[16]  Facebook Help Center, What Page names are allowed on Facebook?, https://www.facebook.com/help/519912414718764 (accessed April 2, 2015).

[17]  Mr. Alcede complains that giving up the passwords to the disputed social media accounts would invade his privacy because the passwords are his "passwords for everything." [Dec. 16 Hr'g Tr. 68:19–20]. In recognition of this concern, the Court will allow Mr. Alcede to change the Twitter password before ceding control of the account to the reorganized Debtor.

account to the reorganized Debtor, this Court will order Mr. Alcede to cease all his activity with regard to the account.

### D. Transferring the Social Media Accounts Does Not Violate Mr. Alcede's Privacy Rights.

At the December 16, 2014 hearing, Mr. Alcede complained that transferring the social media accounts *could* violate his privacy, stating "if I talked to a girlfriend on [Facebook], or if I talked to a doctor or an attorney, you know, they would have access to all that because it is my personal account, and there is no disputing that." [Dec. 16 Hr'g Tr. 50:3–7]. Having found that the former "Tactical Firearms" Facebook Page was in fact separate and distinct from Mr. Alcede's personal Profile, or for that matter his personal Page promoting his "brand," this Court holds that Mr. Alcede waived his right to privacy in any Messages he sent from the former Tactical Firearms Facebook Page.

The situation is somewhat similar to that of an employee who uses a business email account to send personal messages. When determining whether employees have a cognizable expectation of privacy in work email, courts consider whether the employee's privacy expectations were reasonable considering the company's email policy and the company's property interest in the emails. *See, e.g.*, *Miller v. Blattner*, 676 F. Supp. 2d 485, 497 (E.D. La. 2009). In *Miller*, the court found that the employee did not have a legitimate privacy interest in his work email when the company "had an express policy which provided that all emails, personal or professional, that were contained on [company] computers were the property of [the company]." *Id.* Here, though to this Court's knowledge the Debtor had no explicit policy regarding social media, the social media accounts were unambiguously property of the Debtor and not of Mr. Alcede personally. The Court concludes that given that the social media accounts were named for the Debtor and were used for business purposes, Mr. Alcede should have been

aware that the accounts were property of the Debtor and thus that he did not have a personal privacy interest therein.

Mr. Alcede's waiver of privacy in the instant dispute can also be analogized to a client's waiver of the attorney/client privilege when the client communicates with his attorney in the presence of third parties. *See Hodges, Grant & Kaufmann v. U.S. Gov't, Dep't of the Treasury, I.R.S.*, 768 F.2d 719, 721 (5th Cir. 1985) (Because the [attorney/client] privilege protects only confidential communications, the presence of a third person while such communications are made or the disclosure of an otherwise privileged communication to a third person eliminates the intent for confidentiality on which the privilege rests."). Here, Mr. Alcede allowed at least two people access to the Facebook Page—the employee who was responsible for the Constant Contact posts and the business associate who used the Page to advertise his products. Mr. Alcede therefore effectively waived any privacy right he might have had in the former Tactical Firearms Facebook Page.

Therefore, this Court will enjoin Mr. Alcede from further tampering with property of the reorganized Debtor by adding content to or deleting content from the reorganized Debtor's Facebook Page or Twitter account.

## V.   Conclusion

This Court recognizes that the landscape of social media is yet mostly uncharted in bankruptcy. However, to ignore the value of social media assets would do injustice to debtors and creditors alike. At least with regard to a business's social media accounts, this Court finds that the principles that have been developed to deal with the myriad forms of property passing through bankruptcy provide clear guidance as to how to treat such assets. Many more questions have yet to be addressed, such as the proper method of valuing such assets. For today though,

this Court is confident that at the core of this dispute is a familiar story of a disgruntled former business partner attempting to stymie his former associate by seizing control of assets that do not belong to him.

The Court notes that there is evidence suggesting that Mr. Alcede's disruptive behavior is not limited to his seizure of the Debtor's social media accounts. For example, on December 11, 2014, Mr. Wilson's counsel informed the Court that the biggest problem facing the reorganized Debtor was that someone had deleted data from the company's hard drives, including accounting and sales data. [Hearing of December 11, 2014, at 4:35–4:36 p.m.]. According to counsel, Mr. Alcede was one of three people with the capability to have deleted the data. [*Id.*]. Later, at a status conference on January 8, 2015, Mr. Wilson identified the reorganized Debtor's biggest problem as not having access to the company email accounts, which routed to the personal email address of Mr. Alcede. [Hearing of January 8, 2015, at 10:38–10:40 a.m.]. Mr. Alcede could have chosen to assist the reorganized Debtor by transferring control of the Debtor's email accounts, but he failed, and continues to fail, to do so. And, by failing to cooperate in this respect, he has harmed not only his intended target—Mr. Wilson—but also the business itself, which employs all of those veterans about whom Mr. Alcede claims to so deeply care. Stated differently, Mr. Alcede has placed his own personal vendetta against his former business partner above the interests of veterans whose jobs are at stake if the business fails to survive.

Finally, Mr. Alcede's contention that Mr. Wilson and Mr. Boyert have stolen his company could not be further from the truth. In reality, it is Mr. Alcede who has stolen property of the reorganized Debtor. It is this Court's role to prevent such abuse. In this case, control of the reorganized Debtor's social media accounts, like control of customer lists, may well be necessary for a successful reorganization. Consequently, this Court will do everything in its

power to restore the social media assets at issue to the reorganized Debtor, and will not order the expense of more time and resources on an independent third party court aide. This Court's orders will not threaten any rights of Mr. Alcede, whose personal username and password may be easily protected.

An order consistent with this Memorandum Opinion is entered simultaneously on the docket.

Signed on this 3rd day of April, 2015.

Jeff Bohm
Chief United States Bankruptcy Judge