

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

ENTERED
08/13/2015

| | | |
|---|---|---|
| In re: | § | |
| | § | |
| **CTLI, LLC** | § | **Case No. 14-33564** |
| | § | |
| **Debtor.** | § | **Chapter 11** |
| | § | |
| | § | |
| | § | |
| | § | |
| | § | |

## MEMORANDUM OPINION REGARDING MOTION OF JEREMY ALCEDE TO REVOKE CONFIRMATION OF PLAN
[Doc. Nos. 419 & 431]

### I.   INTRODUCTION

This Memorandum Opinion resolves the latest in a series of conflicts between Jeremy Alcede

(Alcede) and Steven Coe Wilson (Wilson), who were the two shareholders of the debtor corporation

when this Chapter 11 case began on June 27, 2014.  [Doc. No. 1]; [Doc. No. 33, p. 6].  CTLI, LLC

dba Tactical Firearms (the Debtor), both before and after reorganization, has operated a gun store and

shooting range, but Alcede has no ownership interest in the restructured company (the Reorganized

Debtor).  The plan of reorganization (the Plan), which divested Alcede of his interest and control of

the Debtor, was proposed by Wilson.   The Court confirmed the Plan on December 8, 2014.   Nine

days later, Alcede challenged confirmation on the grounds that it was procured by fraud.  The next

day, the Court held a hearing on this challenge and found that no fraud had occurred.

Currently at bar is another challenge to the Plan, Alcede's Motion to Revoke Confirmation of

Plan (the Motion), which he filed on June 8, 2015.  [Doc. No. 419].  On June 23, 2015, Wilson filed

the Plan Agent's Response to Jeremy Alcede's Motion to Revoke Confirmation of Plan (the

1

Response). [Doc. No. 431]. After considering the Motion and the Response, the Court now finds that the Motion should be denied in its entirety, for four reasons. First, the Motion is not a valid means of pursuing revocation of a plan, which must be done by initiating an adversary proceeding. *See* Fed. R. Bankr. P. 7001(5). Second, the Motion is *res judicata* to the earlier motion Alcede filed challenging the Plan. Third, Alcede's counsel violated the local rules when he filed the Motion without first conferring with opposing counsel, who could have informed him that the Motion would be barred by *res judicata*. *See* S.D. Tex. L.R. 7(D); S.D. Tex. B.L.R. 1001-1(b). Fourth, the Motion is equitably moot because: (1) no stay of the Plan is in place, (2) the Plan has been substantially consummated, and (3) the relief requested would have a detrimental effect on parties not currently before this Court and on the Plan as a whole. *See In re Blast Energy Servs., Inc.*, 593 F.3d 418, 424 (5th Cir. 2010).

The Court issues these written findings of fact and conclusions of law pursuant to Federal Bankruptcy Rules 9014 and 7052. To the extent any finding of fact is construed as a conclusion of law, it is adopted as such. To the extent any conclusion of law is construed as a finding of fact, it is adopted as such.

## II.   FINDINGS OF FACT

1. On October 14, 2014, Wilson, at that time a minority owner of the Debtor, filed a proposed Chapter 11 plan of reorganization (already defined as the Plan).

2. The Plan included a provision that removed Alcede from control of the business and granted Wilson a 100% ownership interest in the Reorganized Debtor in exchange for Wilson's infusion of $1.5 million in new capital. [Doc. No. 237-1, §§ 7.2 & 7.3].

3. The Plan provided that allowed priority claims totaling $11,832.80 would be paid in full, and

that the remainder of the allowed claims would be paid in the amount of $1,424,684.56.
[Doc. No. 237-1, § 3.1]; [Doc. No. 237-2].  These payments would amount to a 100%
distribution on all but three claims; these three claims would receive an 80% distribution.
[Doc. No. 237-1, § 6.2]; [Doc. No. 237-2].  The Plan also provided that Icon Bank, the
estate's largest creditor, would provide refinancing to the Reorganized Debtor on its claim of
$5,941,108.41.  [Doc. No. 237-1, § 7.3].

4.  The Plan further provided that "[o]n the Effective Date, the Plan shall be deemed to be
substantially consummated under Bankruptcy Code §§ 1101 and 1127(b)."[1]  [*Id.* § 16.20].
The Plan defined "Effective Date" as "[t]he day on which both (1) the Confirmation Order
has become a Final Order, and (2) all conditions specified in Article 13 hereof have been
satisfied or waived."  [Doc. No. 237, § 1.38].  The Plan defined "Final Order" as:

> "[a]n order or judgment which has not been reversed, vacated or stayed and as to
> which "the time to appeal, petition for certiorari or move for a new trial, re-
> argument or rehearing has expired . . . , or [such] new trial, re-argument or
> rehearing shall have been denied or resulted in no modification of such order,
> and the time to take any further appeal, petition for certiorari or move for a new
> trial, re-argument or rehearing shall have expired."

[*Id.* § 1.44].  Article 13 of the Plan provided the following "conditions precedent to the
occurrence of the Effective Date":

1.  The Confirmation Order, in a form and in substance reasonably satisfactory to the
    Plan Agent shall have been entered by the Bankruptcy Court;
2.  The form of all documents necessary or appropriate to give effect to the transactions
    contemplated under the Plan have been approved and executed;
3.  All required consents, approvals, and authorizations, if any, have been obtained;
4.  There shall be no stay of the Confirmation Order in effect and the Confirmation
    Order shall have become a Final Order;

---

[1] Any reference to "the Code" refers to the United States Bankruptcy Code, and reference to any section (i.e., §) refers to a section in 11 U.S.C., which is the United States Bankruptcy Code, unless otherwise noted.  Further, any reference to "the Bankruptcy Rules" refers to the Federal Rules of Bankruptcy Procedure.

    5. The Bar Date[2] has passed; and
    6. All other actions, documents and agreements necessary to implement the Plan shall
       have been effected or executed.

5. On December 2, 2014, this Court conducted a confirmation hearing on the Plan, at which it

   learned that John Boyert (Boyert), assuming that the Court confirmed the Plan, would be

   supervising the day-to-day operations of the Reorganized Debtor. [Hearing of December 2,

   2014, at 4:37 p.m.]. Meanwhile, Wilson himself, upon confirmation, would become the Plan

   agent, responsible for implementing the Plan. [Doc. No. 237-1, pp. 7–10]. Finding that the

   Plan complied with all applicable provisions of the Code, the Court entered an order

   confirming the Plan on December 8, 2014 (the Confirmation Order). [Doc. No. 237]. No

   appeal of the Confirmation Order has ever been taken, nor has anyone ever filed a motion to

   stay the Confirmation Order.

6. On December 18, 2014, Alcede, representing himself *pro se*, filed an emergency motion that

   this Court interpreted as a motion to revoke the Plan (the First Motion to Revoke). [Doc. No.

   260]. The First Motion to Revoke read, in full:

       I, Jeremy Alcede, request and [sic] emergency hearing before the approved plan
       submitted by Mr. Steven Coe Wilson is granted on December 19th 2014. I have
       new information that has come to light that the court needs to hear. Referring
       Document 237 and 246 [the Confirmation Order and the Post-Confirmation
       Order and Notice].

7. Also on December 18, 2014, Icon Bank filed its Response to Pleading Filed at Docket No.

   260 by Jeremy Alcede, arguing that the First Motion to Revoke should be denied. [Doc. No.

   262].

8. On December 19, 2014, the Court held the emergency hearing requested by Alcede on the

---

[2] The "Bar Date" was defined as November 14, 2014. [Doc. No. 237, § 1.18].

First Motion to Revoke, at which time three witnesses testified: (1) Boyert; (2) Sarah Alcede,

Alcede's estranged wife and an employee of the gun shop at that time; and (3) Rand Lassus,

a representative of Icon Bank.

9. Alcede's argument at the December 19, 2014 hearing was that Wilson had misled the Court

into believing that the Reorganized Debtor would be owned 100% by Wilson, when in reality

(i.e. Alcede's reality) Wilson had transferred a 70% ownership interest to Boyert. [Doc. No.

259, Obj. to Proposed Order & Doc. No. 260, Obj. to Conf. Order Hr'g Tr. 8:22–9:16, Dec.

19, 2014] (hereinafter Dec. 19 Hr'g Tr.).  Counsel for Wilson and Icon Bank made closing

arguments urging denial of the First Motion to Revoke. [*Id.* at 2, 22:16–27:25].  Neither

objected to Aldede's failure to file the First Motion to Revoke as an adversary proceeding.

[*Id.*].

10. At the conclusion of the December 19, 2014 hearing, the Court orally denied the First Motion

to Revoke. [*Id.* at 37:12–43:24].  The Court reasoned that Alcede had not established that

the Plan was procured by fraud, which would be the only basis upon which the Court could

revoke the Confirmation Order under the Code. [*Id.*]; *See* 11 U.S.C. § 1144.  The Court

explained that it had known that Boyert would play a significant role in the management of

the Reorganized Debtor, and there was nothing in the Plan that prohibited Wilson from

transferring equity to Boyert. [Dec. 19 Hr'g Tr. 39:6–41:7].  Therefore, though the Court did

not decide whether such a transfer had occurred, it determined that such a change in

ownership would not have affected its decision to approve the Plan. [*Id.* at 39:6–41:15].

11. Also on December 19, 2014, the Court memorialized its decision by docketing an order

denying the First Motion to Revoke (the Order Denying First Motion to Revoke). [Doc. No.

5

263]. Alcede did not file a notice of appeal or seek reconsideration of the Order Denying First Motion to Revoke within the 14 days allowed by the Rules. *See* Rule 8002 (governing appeals); Rule 9023 (governing motions for reconsideration). In fact, at the hearing on December 19, 2014, Alcede told the Court after its oral ruling: "I appreciate your ruling. And I agree with it." [Dec. 19 Hr'g Tr. 44:10]. Because Alcede neither appealed the Order Denying First Motion to Revoke nor sought reconsideration of this order, the Order Denying First Motion to Revoke became a final order on January 3, 2015.[3]

12. On January 9, 2015, Wilson's counsel certified that all of the conditions precedent to the occurrence of the Effective Date, with the exception of the closing of the Icon Bank debt, had been satisfied, and that the Reorganized Debtor was operating as a going concern. [Doc. No. 280]. On February 2, 2015, Wilson's counsel certified that the Icon Bank debt had been refinanced. [Doc. Nos. 293 & 294].

13. On January 9, 2015, Wilson's counsel certified that the $11,832.80 in priority claims had been paid. [Doc. No. 280]. On May 13, 2015, Wilson filed a sworn quarterly report representing that the Reorganized Debtor had paid a total of $1,058,689.86 on the remaining allowed claims. [Doc. No. 404, pp. 6–7]. By April 22, 2015, claims that were withdrawn or to which objections were sustained totaled $165,515.11. [Doc. Nos. 301, 302, 303, 304, 305, 337, 339, 363, 366, 370, 371 & 380].

14. On February 27, 2015, this Court entered an order extending the deadline to object to or pay

---

[3] To compute time under the Code "[w]hen the period is stated in days or a longer unit of time:
(A) exclude the day of the event that triggers the period;
(B) count every day, including intermediate Saturdays, Sundays, and legal holidays; and
(C) include the last day of the period, but if the last day is a Saturday, Sunday, or legal holiday, the period continues to run until the end of the next day that is not a Saturday, Sunday, or legal holiday." Fed. R. Bankr. P. 9006(a)(1).

one claim, for $239,182.99, to June 8, 2015. [Doc. No. 308]. No objection was filed by June 8, 2015, and, in the Response, Wilson's counsel represents that the Reorganized Debtor has paid this claim. [Doc. No. 431, ¶¶ 7–9]. The Response further represents that the payment of this claim completed the Reorganized Debtor's satisfaction of all allowed pre-petition unsecured claims under the Plan. [*Id.* at ¶ 9].

15. In sum, by the time Alcede filed the Motion on June 8, 2015, the Reorganized Debtor had paid or otherwise resolved all of the allowed claims under the Plan.

16. On the same day that Alcede filed the First Motion to Revoke—December 18, 2014—he filed a parallel motion challenging the Confirmation Order insofar as it required him to grant the Reorganized Debtor access to its Facebook and Twitter accounts. [Doc. No. 259]. On April 3, 2015, the Court issued an order ruling that these social media accounts were property of the Reorganized Debtor and that Alcede was therefore required to turn over access to the accounts to a representative of the Reorganized Debtor (the Order on Social Media). [Doc. No. 335]. The Order on Social Media was accompanied by a Memorandum Opinion, *In re CTLI, LLC*, 528 B.R. 359 (Bankr. S.D. Tex. 2015).

17. On April 9, 2015, Leif Olson (Olson), a seasoned lawyer who once served as a law clerk to one of the district judges of the Southern District of Texas, filed a notice of appearance as counsel for Alcede. [Doc. No. 345]. Later that day, Alcede, now represented, filed a motion to reconsider the Order on Social Media (the First Motion to Reconsider). [Doc. No. 346]. However, Olson failed to submit a proposed order with the First Motion to Reconsider. [*Id.*]. On April 10, 2015, this Court denied the First Motion to Reconsider for noncompliance with

7

either Local Rule 7.1(C) or Local Rule 7.2,[4] which require that both opposed and unopposed motions be accompanied by a separate proposed order granting the relief requested. [Doc. No. 350]. Alternatively, the Court denied the First Motion to Reconsider for the same Local Rule violation contained in the instant Motion—the failure to include a certificate of conference with opposing counsel. [*Id.*]. In its order denying the First Motion to Reconsider, this Court expressly warned Olson that he "is charged with knowing the local rules that govern practice in the Southern District of Texas, and this Court intends to enforce these rules." [*Id.*].

18. On April 14, 2015, through his attorney, Alcede filed an amended motion to reconsider the Order on Social Media (the Second Motion to Reconsider). [Doc. No. 355]. This time, Olson did comply with the Local Rules. His compliance notwithstanding, this Court denied the Second Motion to Reconsider on the merits in a written order docketed on April 21, 2015. [Doc. No. 374].

19. On June 8, 2015, at 9:25 p.m., Alcede, through his attorney, filed the instant Motion, which is his second attempt to convince this Court that it should revoke the Plan. June 8, 2015 was the last day on which Alcede could seek revocation of the Confirmation Order, according to the 180-deadline imposed by § 1144.[5] The Motion alleges that the Confirmation Order was procured by fraud, specifically:

The Court's approval of the reorganization plan was premised on a cash infusion

---

[4] Hereinafter, any reference to "the Local Rules" refers to the Local Rules for the United States District Court for the Southern District of Texas. Rule 1001-1(b) of the Local Rules for the United States Bankruptcy Court for the Southern District of Texas expressly incorporates the Local Rules in bankruptcy court.

[5] Section 1144 provides that "[o]n request of a party in interest at any time before 180 days after the date of the entry of the order of confirmation, and after notice and a hearing, the court may revoke such order if and only if such order was procured by fraud."

by the plan agent, Stephen Coe Wilson, that would give him a 100% equity stake in the reorganized debtor. That isn't what happened. Contrary to the representations of Wilson and the reorganized debtor's general manager, John Boyert, Wilson and Boyert have an agreement for Boyert to obtain an ownership interest. This material information was withheld from the creditors and the Court: It wasn't included in the disclosure statement, and it was denied under oath.

This material information was purposefully withheld so the Court would confirm the plan. The confirmation was procured through fraud, and the Court should revoke it.

[Doc. No. 419, p. 1].

20. The Motion does *not* include "an averment that (1) The movant has conferred with the respondent and (2) Counsel cannot agree about the disposition of the motion" as required by Local Rule 7(D). Instead, the Motion includes the following "Certificate of Conference":

I [i.e. Olson] was unable to confer with Rick Kincheloe, counsel for Wilson, because of the late hour when this motion was ready to be filed. I assume that Wilson opposes this motion because it seeks to revoke the plan he proposed, but I will update this certificate after conferring with Mr. Kincheloe.

21. On June 23, 2015, Wilson filed his Response to the Motion. [Doc. No. 431]. In relevant part, the Response argues that the Motion should be denied because: (1) it is *res judicata* to the First Motion to Revoke; (2) it was not filed as an adversary proceeding as required by Rule 7001(5); (3) Olson failed to confer with opposing counsel as required by Local Rule 7(D); and (4) even if the Motion's allegations were factually proven, it would not show fraud. [*Id.*]. In the Response, Rick Kincheloe, Wilson's counsel, confirms that Olson first attempted to confer about the Motion at 9:34 p.m.—i.e. 9 minutes *after* Olson filed the Motion with the Court. [Doc. No. 431].

### III.   CONCLUSIONS OF LAW

#### A. Jurisdiction

The Court has jurisdiction over this dispute pursuant to 28 U.S.C. § 1334(b).  28 U.S.C. §

1334(b) provides that "the district courts shall have original but not exclusive jurisdiction of all civil

proceedings arising under title 11 [the Bankruptcy Code], or arising in or related to cases under title

11."  District courts may, in turn, refer these proceedings to the bankruptcy judges for that district.

28 U.S.C. § 157(a).  In the Southern District of Texas, General Order 2012-6 (entitled General Order

of Reference) automatically refers all eligible cases and proceedings to the bankruptcy courts.

The phrase "arising under title 11" refers to "those proceedings that involve a cause of action

created or determined by a statutory provision of title 11." *Matter of Wood*, 825 F.2d 90, 96 (5th Cir.

1987).  Here, Alcede seeks revocation of the Plan under § 1144, which provides that a bankruptcy

court "may revoke [a confirmation] order if and only if such order was procured by fraud."  Thus, the

relief requested in the Motion is created by an express Code provision: § 1144.  Consequently, the

subject matter is within federal district court jurisdiction pursuant to 28 U.S.C. § 1334(b), and has

been appropriately referred to this Bankruptcy Court under General Order 2012-6.

#### B. Venue

Venue is proper pursuant to 28 U.S.C. § 1408(1).

#### C. Constitutional Authority to Enter a Final Order

In the wake of the Supreme Court's ruling in *Stern v. Marshall*, 131 S.Ct. 2594 (2011), this

Court must also evaluate whether it has the constitutional authority to enter a final order adjudicating

the dispute at bar.  In *Stern,* the Supreme Court held that 28 U.S.C. § 157(b)(2)(C)—which

authorizes bankruptcy judges to issue final judgments in counterclaims by a debtor's estate against

10

entities filing claims against the estate—is an unconstitutional delegation of Article III authority to bankruptcy judges, at least when the dispute being adjudicated is based on state common law and does not affect the claims adjudication process. *Id.* at 2616. However, *Stern* affirmed the "public rights exception" to unconstitutional delegation, which holds that Article I judges may finally decide issues that "flow from a federal statutory scheme" or are "completely dependent upon adjudication of a claim created by federal law." *Id.* at 2598 (internal citations omitted).

The dispute at bar is not a counterclaim of the Debtor, nor does it arise out of state law. Rather, the dispute arises entirely out of § 1144, which prescribes the circumstances under which a bankruptcy court may revoke a confirmation order. State law has no equivalent to this provision; it is purely a creature of the Code. The dispute at bar both "flows from a federal statutory scheme" and is "completely dependent upon adjudication of a claim created by federal law," as it concerns only the federal privilege of discharge in bankruptcy. Accordingly, this Court has the constitutional authority to enter a final order on the Motion.

Alternatively, this Court has the constitutional authority to enter a final order because the parties have consented to adjudication by this Court. *See Wellness Int'l Network, Ltd. v. Sharif*, 135 S. Ct. 1932, 1939 (2015). Indeed, Alcede chose to file the Motion in this Court, Wilson filed his Response in this Court, and neither party—both of whom are represented by counsel in this dispute[6]—has objected to this Court's constitutional authority to enter a final order. If this is not consent, then nothing is.

### D. The Motion Is Denied Because the Relief Sought Requires the Filing of an Adversary Proceeding Within 180 Days of the Entry of the Order of Confirmation.

Bankruptcy disputes take two distinct forms: (1) contested matters, which are initiated by a

motion filed in the main bankruptcy case; and (2) adversary proceedings, which are initiated by a formal complaint that creates a separate lawsuit treated similarly to a civil suit outside of bankruptcy. *Matter of Zale Corp.*, 62 F.3d 746, 763 (5th Cir. 1995). Rule 7001 lists the different types of disputes that are properly initiated by an adversary proceeding. Included in this list is "a proceeding to revoke an order of confirmation of a chapter 11, chapter 12 or chapter 13 plan." Fed. R. Bankr. P. 7001(5).

When a party seeks revocation of a confirmation order through a contested matter, the bankruptcy court must dismiss the motion unless all parties consent to allowing the procedural error. *In re Air One, Inc.*, 75 B.R. 1003, 1004–05 (Bankr. E.D. Mo. 1987). Consent can be express or implied. *See In re V & M Mgmt.*, 215 B.R. 895, 897–98 (Bankr. D. Mass. 1997) (affirming the conversion of a motion to revoke to an adversary proceeding when the parties expressly assented); *Zale Corp.*, 62 F.3d at 763 (defining when parties have impliedly waived the right to an adversary proceeding).

Parties implicitly consent to going forward without an adversary proceeding "when the court afforded them all the protections of an adversary proceeding yet they knowingly failed to litigate a Rule 7001 issue which they had an opportunity to litigate." *Zale Corp.*, 62 F.3d at 763; *see also In re Ulmer*, 1999 WL 1240788 (5th Cir. 1999) (unpublished). In *Ulmer*, the bankruptcy court granted a motion for turnover of property that should have been brought as an adversary proceeding. *Id.* at *1. When the purported purchaser of the property objected, the Fifth Circuit held that he had "waived any objection because he had notice of the . . . motion," had "failed to object until after [it] was granted," and "had been granted a hearing where he was given the opportunity to address the issues."

---

[6] Olson has since filed a motion to withdraw as counsel for Alcede. [Doc. No. 432]. This Court granted Olson's motion on the same day it issued the order resolving the instant dispute, August 13, 2015. [Doc. No. 442].

*Id.*

Here, Wilson has clearly not consented to addressing the motion to revoke without an adversary proceeding, which is required by Rule 7001.  Indeed, Wilson expressly objected in the Response, arguing that "The [Motion] violates Fed. R. Bankr. P. 7001, and the Court should deny it due to the procedural defect." [Doc. No. 431, ¶¶ 5–6].  By contrast, on December 19, 2014, none of the parties objected to the First Motion to Revoke being prosecuted as a contested matter, and proceeded to fully participate in an evidentiary hearing on the issue.  [Findings of Fact Nos. 6–10].  The Court interpreted this participation as implied waiver of the right to object to the procedural defect in the First Motion to Revoke, and therefore the Court considered that motion on the merits. Here, conversely, where Wilson, in the Response, has expressly objected at the first opportunity to the defect, and has not participated in the dispute by any other means, there is no question that waiver has *not* occurred.

The only issue this Court must decide before dismissing the Motion for this procedural defect is whether it should extend any special leniency considering that the Response was filed after the time for initiating an adversary proceeding had passed.  *See* 11 U.S.C. § 1144; *In re Zolner*, 249 B.R. 287, 293 (N.D. Ill. 2000).  In *Zolner*, the movant filed a motion to revoke confirmation approximately six weeks in advance of the 180-day deadline.  *Id.* at 291.  Before the deadline expired, the plan proponent filed a substantive response; then, *after* the deadline expired, the plan proponent complained that the motion should be dismissed because it was not filed as an adversary proceeding.  *Id.*  On these facts, the district court declined to decide whether the motion should be dismissed for the procedural defect, resolving the appeal on another issue.  *Id.* at 293.

The instant dispute is easily distinguishable from *Zolner*.  Unlike the movant in *Zolner*,

13

Alcede waited until the very last day to file the Motion. [Finding of Fact No. 19]. Unlike the plan proponent in *Zolner*, Wilson objected to the procedural defect in his first and only response. [Finding of Fact No. 21]. Therefore, unlike the plan proponent in *Zolner*, it was not Wilson's choice to object to the procedural defect only after the movant could no longer correct it. Thus, the situation Alcede finds himself in is much less sympathetic than the situation in *Zolner*, which that court evidently considered a close call. *See* 249 B.R. at 293. Further strengthening this Court's decision that dismissing the Motion procedurally would do no injustice to Alcede is the fact that the Court already granted Alcede a full hearing on the same issue on December 19, 2014. [Findings of Fact Nos. 6–10].

In sum, the Court finds that the instant dispute presents a clear case of a motion that is procedurally improper under Rule 7001, and should therefore be dismissed. *See, e.g., Matter of Vill. Mobile Homes, Inc.*, 947 F.2d 1282, 1283 (5th Cir. 1991) (vacating a bankruptcy court's judgment on an issue that was improperly raised in a motion when an adversary proceeding was required).

### E. The Motion Is Barred by *Res Judicata.*

In the alternative, the Motion must still be denied as *res judicata*. The doctrine of *res judicata* bars proceedings when "(1) the same issue has previously been resolved (2) between the same parties (3) by a final judgment on the merits (4) rendered by a court of competent jurisdiction." *Matter of Baudoin*, 981 F.2d 736, 740 (5th Cir. 1993). Here, all four elements are met.

First, the same issue raised in the Motion was resolved by this Court's Order Denying First Motion to Revoke. [Findings of Fact Nos. 6, 9, 10 & 11]. For *res judicata* purposes, the "same issue" is one which is based upon the same nexus of facts. *Matter of Howe*, 913 F.2d 1138, 1144 (5th Cir. 1990). In prosecuting the First Motion to Revoke, Alcede argued that Wilson had

14

fraudulently obtained confirmation of the Plan by assuring the Court that he would become the 100%

owner of the Reorganized Debtor, when, according to Alcede, Wilson transferred a 70% ownership

share to Boyert. [Finding of Fact No. 9]. In the instant Motion, Alcede argues that Wilson

fraudulently obtained confirmation by hiding from the Court his intention to transfer an ownership

interest to Boyert. [Finding of Fact No. 19]. It is clear that the Plan caused 100% of the equity in the

Reorganized Debtor to vest in Wilson. [Findings of Fact Nos. 2 & 5]. It is not clear at this time

whether Wilson still retains 100% equity, or whether Boyert and/or some other person now shares in

this ownership. [Finding of Fact No. 10]. Regardless, both the First Motion to Revoke and the

instant Motion raise the same issue, based on the same facts—whether Wilson's failure to disclose to

this Court his intention to transfer equity to Boyert (if he indeed had such an intention) constitutes

fraud. The Court has already resolved this issue in the negative. [*Id.*]. Therefore, "the same issue

has previously been resolved."

Second, the parties to the pending dispute initiated by the Motion are the same as the parties

to the dispute created by the First Motion to Revoke. In both disputes, Alcede is the sole movant,

and in both disputes, Wilson is the Plan agent whom Alcede attacks. [Findings of Fact Nos. 5, 6, 8,

9 & 19].

Third, the Court's prior resolution of this issue was a "final judgment on the merits." This

Court held a full evidentiary hearing on the First Motion to Revoke, and issued a ruling denying it on

the merits after finding that Alcede had not proven any fraud. [Findings of Fact Nos. 8, 9, 10 & 11].

Further, neither Alcede nor any other party appealed this Court's Order Denying First Motion to

Revoke. [Finding of Fact No. 11]. In fact, Alcede stated in open court that he agreed with the ruling.

[*Id.*]. Therefore, the Order Denying First Motion to Revoke became a final order on January 3,

2015, when the 14-day period to appeal or move for reconsideration expired pursuant to Rules 8002 and Rule 9023. [*Id.*]; *see also Civil Aeronautics Bd. v. Delta Air Lines, Inc.*, 367 U.S. 316, 346–47 (1961) (holding that a decision is not final until the expiration of the period to appeal or move for new trial, rehearing, or reconsideration).

Fourth, for the same reasons this Court has jurisdiction over the instant dispute, *see supra* sec. III.A, this Court is a "court of competent jurisdiction" for *res judicata* purposes. *In re Paige*, 610 F.3d 865, 872 (5th Cir. 2010) (holding that a bankruptcy court was a court of "competent jurisdiction" for *res judicata* purposes because it had jurisdiction over the underlying issue).

Therefore, all four elements have been met to establish that the instant Motion should be denied as *res judicata* to the First Motion to Revoke.

**F. The Motion is Denied Due to the Failure of Olson to Comply with Local Rule 7(D).**

In the further alternative, the Motion is denied due to Olson's violation of Local Rule 7(D). The Local Rules are in place to ensure judicial efficiency and fairness in the adjudication of disputes in this Court. *See Matter of Adams*, 734 F.2d 1094, 1102 (5th Cir. 1984) ("Promoting the efficiency of the court is the central purpose of local rules."). Specifically, Local Rule 7(D) requires that counsel confer with opposing counsel *prior to filing a motion*. The "Certificate of Conference" included in the Motion indicates that Olson was aware of this Local Rule, but blatantly disregarded it. [Finding of Fact No. 20].

In the "Certificate of Conference," Olson explains that he was unable to confer with opposing counsel "because of the late hour when this motion was ready to be filed." [*Id.*]. However, the fact that Olson filed the Motion on the last day in which the Plan could be revoked is no excuse for noncompliance with this Local Rule. If attorneys could avoid conferring with opposing counsel by

filing eleventh-hour motions, it would make a mockery of Local Rule 7(D). Furthermore, Olson in particular had no evident reason for his failure to file the Motion earlier. The facts alleged in the Motion are the same facts Alcede was aware of at least by the time he filed the First Motion to Revoke on December 18, 2014, [Findings of Fact Nos. 6 & 9], and Olson has been representing Alcede at least since April 9, 2015, [Finding of Fact No. 17].

In the "Certificate of Conference," Olson assures the Court that he "assume[d] that Wilson opposes this motion because it seeks to revoke the plan he proposed . . . ." This statement reflects Olson's profound lack of respect for the Local Rules. In fact, the details of this dispute provide a helpful illustration of the importance of Local Rule 7(D), which, despite Olson's implication, is far from a nullity in this instance. Had Olson bothered to confer with Wilson's counsel prior to filing the Motion, Wilson's counsel would have informed Olson about the hearing on the First Motion to Revoke, and the resulting Order Denying First Motion to Revoke. Armed with this information, Olson should have had a frank discussion with Alcede in which Olson could have confirmed that Alcede, representing himself *pro se*, had previously litigated the same issue. If Olson had gained this knowledge, he would have—or at least should have—refrained from filing the Motion. And, if Olson had not filed the Motion, he would have saved this Court and all of the parties involved in the present dispute valuable time and resources. Specifically, this Court, as well as Wilson, has had to spend time responding to a motion to revoke that should never have been filed, as well as a motion for sanctions that Wilson has since filed seeking to recover the attorneys' fees and costs that he has incurred in fending off the motion to revoke.

Thus, it is not just the *fact* of opposition, but the *act* of conferring with opposing counsel itself which is significant. This District has chosen to emphasize the importance of this act through

the enactment of Local Rule 7(D).

This Court recognizes that denial of the Motion, based upon Olson's failure to comply with a Local Rule, may, upon first impression, appear harsh. However, the details of this dispute convince this Court that dismissal is appropriate and well within the equitable powers granted to this Court by § 105, which include the power to "tak[e] any action or mak[e] any determination necessary or appropriate to enforce or implement court orders or rules." Though dismissal or denial of a motion is a harsh remedy, it can be appropriate under a court's equitable power when the "underlying attorney misconduct was . . . egregious, unduly dilatory, or contumacious." *Kovilic Const. Co. v. Missbrenner*, 106 F.3d 768, 773 (7th Cir. 1997).

The Fifth Circuit has defined "contumacious" as "willful misconduct" or a "stubborn resistance to authority." *Milan v. USAA General Indem. Co.*, 546 F.3d 321, 327 (internal quotations omitted). In *Kovilic Const. Co.*, the Seventh Circuit reversed a district court's dismissal of an adversary proceeding as a consequence of two local rule violations, when the bankruptcy court had expressly countenanced the violations. 106 F.3d at 770–71. Here, by contrast, this Court did the opposite of expressly countenancing the violations—it had expressly *warned* Olson of the importance of following the Local Rules in its order of April 10, 2015. [Finding of Fact No. 17].

Olson's "Certificate of Conference" shows that he stubbornly and willfully ignored this Court's warning by deliberately violating Local Rule 7(D). His proffered excuse that he could not abide by the rule because he chose to file the motion at the last minute, in this context, only adds insult to injury. Finally, Olson's weak excuse for not contacting opposing counsel does not come within hailing distance of being credible. In the Response, counsel for Wilson has informed this Court that Olson in fact *did* attempt to contact him on the same evening that the Motion was filed,

but only *after* filing it. [Finding of Fact No. 21]. Therefore, Olson apparently did not believe his own excuse that the hour was too late to contact opposing counsel. He apparently believed only that it was too late to give opposing counsel the opportunity to affect Olson's course of legal action. As the Court has already explained, giving opposing counsel the opportunity to contribute to a more efficient resolution of disputes is part of the purpose behind Local Rule 7(D).

In sum, Olson deliberately disobeyed a Local Rule after this Court had previously warned him that he "is charged with knowing the local rules that govern practice in the Southern District of Texas, and this Court intends to enforce these rules." [Finding of Fact No. 17]. Olson's haughty and cavalier attitude towards the Local Rules is particularly disturbing given the fact that he himself, after graduation from law school, served as a law clerk to one of the district judges of the Southern District of Texas. [Finding of Fact No. 17]. The Court therefore finds it appropriate to dismiss the Motion in order to "implement court orders or rules." *See* 11 U.S.C. § 105. Although this result may be unfortunate for Alcede, it is an integral fact of the legal system that mistakes or misjudgments of counsel may harm their clients. *See Pryor v. U.S. Postal Serv.*, 769 F.2d 281, 288 (5th Cir. 1985) ("[I]t has long been held, particularly in civil litigation, that the mistakes of counsel, who is the legal agent of the client, are chargeable to the client, no matter how 'unfair' this on occasion may seem.") (internal citation omitted). Clients may always seek redress from counsel to remedy this harm within the bounds of the law. *See id.* ("[T]he proper recourse for the aggrieved client . . . is to seek malpractice damages from the attorney.") (internal citation omitted).

### G. The Motion is Denied as Equitably Moot.

In the further alternative, the Motion should be denied under the doctrine of equitable mootness in bankruptcy. The doctrine of equitable mootness authorizes dismissal of actions that

19

would affect a Chapter 11 plan "when the reorganization has progressed too far for the requested relief practicably to be granted." *Blast Energy Servs.*, 593 F.3d at 424. The doctrine of equitable mootness applies to a bankruptcy court's consideration of a motion to revoke a plan confirmation order. *In re Delta Air Lines, Inc.*, 386 B.R. 518, 534 (Bankr. S.D.N.Y. 2008).

A bankruptcy court properly denies a motion as equitably moot "when, even though effective relief could conceivably be fashioned, implementation of that relief would be inequitable." *Id.* at 537. In the Fifth Circuit, courts consider three factors to determine whether an action is equitably moot: "(i) whether a stay has been obtained, (ii) whether the plan has been 'substantially consummated,' and (iii) whether the relief requested would affect either the rights of parties not before the court or the success of the plan." *Blast Energy Servs.*, 593 F.3d at 418. Of these, the third factor represents the ultimate inquiry. *The Nancy Sue Davis Trust v. Davis Petroleum Corp.*, 402 B.R. 203 (S.D. Tex. 2009). In sum, the doctrine allows courts to deny relief that would "likely unravel the plan." *Blast Energy Servs.*, 593 F.3d at 425.

Here, all three of the equitable mootness factors are present, and most importantly, granting the Motion would unravel the substantially consummated Plan, significantly harming creditors who have already been paid under the Plan. First, no stay of the Plan has been obtained in this case. [Finding of Fact No. 5]. Second, the Plan has been "substantially consummated," both under its own terms and under the relevant case law. The Plan became substantially consummated according to its own terms on the "Effective Date," when both the Confirmation Order had become final and all actions necessary to implement the Plan had been taken. [Finding of Fact No. 4]. The Effective Date occurred by February 2, 2015, when Wilson's counsel certified that the Icon Bank refinancing had closed. [Finding of Fact No. 12]. Therefore, under its own terms, the Plan was substantially

consummated by that date.

Furthermore, the Plan's definition of substantial consummation accords with Fifth Circuit law, which provides that a Plan is substantially consummated when the debtor "ha[s] either paid or arranged for payment of all of its creditors." *Blast Energy Servs.*, 593 F.3d at 425. By requiring for substantial consummation that "[t]he form of all documents necessary or appropriate to give effect to the transactions contemplated under the Plan have been approved and executed" and that "all other actions, documents and agreements necessary to implement the Plan shall have been effected or executed," the Plan defined the term to require arrangement of payment for all creditors. [*See* Finding of Fact No. 4]. Should there be any doubt as to this interpretation, the Plan was undoubtedly substantially consummated by the time of the filing of the instant Motion, when all allowed claims under the Plan had been settled or paid. [*See* Finding of Fact No. 15].

Most fundamentally, were this Court to grant the Motion to Revoke, it would substantially unravel the Plan, significantly harming third parties. A motion to revoke confirmation of a plan is absolute; there can be no partial revocation of a confirmation order. *In re Motors Liquidation Co.*, 462 B.R. 494, 500 (Bankr. S.D.N.Y. 2012). Therefore, granting this Motion would "knock the props out from under the authorization for every transaction that has taken place, and would do nothing other than create an unmanageable, uncontrollable situation for the Bankruptcy Court." *The Nancy Sue Davis Trust*, 402 B.R. 203, at *3–4 (internal quotation omitted). Here, the Reorganized Debtor has settled or paid all of its debts under the Plan. [Finding of Fact No. 15]. The revocation of the Confirmation Order would require the reversal of each and every one of those consummated payments, an unacceptable result for the numerous creditors who are not parties to this dispute.

Therefore, even if this Court were to consider the Motion on the merits, it would deny the

Motion under the doctrine of equitable mootness.

## IV.   CONCLUSION

The Motion underscores Alcede's continued unwillingness to accept the fact that he no longer is in control of the business that he started several years ago. He has only himself to blame. It was Alcede, after all, who, after convincing Wilson to infuse $2.2 million into the business in exchange for giving Wilson a 30% minority interest, then froze Wilson out of the business to such a degree that Wilson filed suit in state court to seek appointment of a receiver. [Doc. No. 4., Mot. To Use Cash Coll. & Doc. No. 5, Mot. To Pay Prepet. Wages Hr'g Tr. 16:18–24:18, July 3, 2014]; [Doc. No. 26]. It was Alcede who, just after the state court appointed a receiver, filed a Chapter 11 petition for the company in order to use the automatic stay to remain in control of the business himself and prevent the receiver from taking over the reins of the operations. [Doc. No. 1]. And yet, despite this Court giving Alcede the opportunity for several months to continue to operate the business and procure financing necessary to successfully reorganize the company, he failed miserably. Not once over the six-month period of his stewardship did he bring any investor or lender to court who was willing to testify that funds were available for the reorganization of the business. Alcede always talked a good game—for example, stating in open court: "I don't mean to toot my own horn, but I'm a PR genius . . . ." [Doc. No. 60, p. 125]. But Alcede never delivered: during his tenure, the Debtor never filed a plan of reorganization, nor did Alcede file one independently. Alcede was—to use the lexicon of a successful businessman like Wilson—"all hat and no cattle."

By contrast, Wilson exhibited his business acumen by using the bankruptcy laws to his own advantage after Alcede failed to procure funding for reorganization. Wilson filed his own plan of reorganization—i.e. the Plan. [Finding of Fact No. 1]. Under the Plan, Wilson would infuse $1.5

22

million of new capital into the business so that all allowed claims could be paid; in exchange, he would receive a 100% stock ownership in the Reorganized Debtor and Alcede would be removed from all involvement with the company. [Finding of Fact No. 2]. Not surprisingly, the proposed Plan received support from the creditors, and the Court confirmed the Plan. [Finding of Fact No. 5].

Alcede then proceeded to immediately go on the attack against Wilson. Representing himself *pro se*, he filed a motion alleging that Wilson had obtained confirmation of the Plan by fraud. [Findings of Fact Nos. 6 & 9]. His effort was a woeful failure—so much so that after this Court ruled from the bench that Wilson had done nothing wrong, Alcede himself stated that he agreed with the ruling. [Findings of Fact Nos. 10 & 11]. This debacle, however, did not stop Alcede from further attempting to thwart the Reorganized Debtor's operations and efforts to repay its creditors.

He next refused to turn over access to the Reorganized Debtor's Facebook and Twitter accounts—in violation of the Confirmation Order. [Finding of Fact No. 16]. Only after this Court held Alcede in contempt and had him taken into custody for a total of 48 days did he turn over the passwords. [Doc. No. 344]; [Doc. No. 415]; [Hearing of April 17, 2015, at 4:09 p.m.]. Once again, Alcede had failed.

Clearly frustrated by his numerous failures throughout this Chapter 11 case, and apparently bereft of new tactics for undermining his former business partner, Alcede once again alleges that Wilson obtained confirmation of the Plan by fraud and that therefore this Court should revoke the Plan. Alcede is, as another bankruptcy court once described a litigant who filed an unsuccessful motion to defeat a plan, "a serial plaintiff who ignores adverse judicial determinations and continues to pursue frivolous litigation. . . . and repeat the same arguments." *In re Pulp Finish 1 Co.*, No. 12-13774 (SMB), 2014 WL 201482, at *2 (Bankr. S.D.N.Y. Jan. 16, 2014). It is no wonder that

Wilson, fed up with spending time and attorneys' fees fending off Alcede's attacks, has filed a motion for sanctions. [Doc. No. 434]. This Court will resolve the motion for sanctions on another day. For now, it focuses solely on the pleading presently before it, and finds that Alcede's pending request to revoke confirmation of the Plan should be denied. Alcede once again has missed the mark by a wide margin. Indeed, he continues to shoot himself in the foot.

For the foregoing reasons, the Court denies the Motion, and will not revoke the Confirmation Order. A separate order will be entered on the docket simultaneously herewith.

Signed this 13th day of August, 2015.

Jeff Bohm
United States Bankruptcy Judge